STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Roosevelt WILLIAMS, Defendant-Appellant.

Supreme Court

*No. 96–1821–CR. Oral argument November 2, 2000.—Decided March 13, 2001.*

2001 WI 21

(Also reported in 623 N.W.2d 106.)

For the plaintiff-respondent-petitioner the cause was argued by *Warren D. Weinstein*, assistant attorney general, with whom on the briefs was *James E. Doyle*, attorney general.

For the defendant-appellant there was a brief and oral argument by *Melinda A. Swartz*, assistant state public defender.

¶ 1. N. PATRICK CROOKS, J. We review again the court of appeals decision that reversed the conviction of the defendant, Roosevelt Williams, *State v. Williams*, 214 Wis. 2d 412, 570 N.W.2d 892 (Ct. App. 1997). On April 27, 1999, this court issued a decision,

*State v. Williams*, 225 Wis. 2d 159, 591 N.W.2d 823 (1999), that reversed the court of appeals decision. However, on April 3, 2000, the United States Supreme Court granted certiorari and vacated (without review) our decision, and remanded the case for further consideration in light of *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375 (2000). *Williams v. Wisconsin*, 529 U.S. 1050, 120 S. Ct. 1552 (2000).

¶ 2. *Florida v. J.L.*, 529 U.S. 266 (2000), relates to the first of the two issues facing this court, whether an anonymous tip containing a contemporaneous report of drug trafficking, combined with independent observations and corroboration of details from the tip justified the investigatory stop of Williams. Judge James Eaton, assigned to Milwaukee County Circuit Court, found that there was reasonable suspicion to justify the stop. The court of appeals reversed, concluding that the police officers did not have the requisite reasonable suspicion based upon the information before them. Now having the benefit of the Supreme Court's guidance in *Florida v. J.L.*, we conclude that, considering the totality of the circumstances, including the indicia of reliability surrounding the anonymous tip and the police officers' additional observations, the officers reasonably suspected that criminal activity was afoot.

¶ 3. The second issue before us is whether there was reasonable suspicion for the police officers' subsequent search of the vehicle. The circuit court found that there was, and the court of appeals did not reach that question. We agree with the circuit court that under the circumstances, the officers reasonably suspected that they were in physical danger, justifying the protective search. We therefore reverse the court of appeals, and approve the decision of the circuit court,

which denied Williams' motion to suppress evidence obtained from the search. Accordingly, we uphold the circuit court's judgment of conviction.

I

¶ 4. Sometime during the afternoon of November 2, 1995, a 9–1–1 telephone call[1] was received from an anonymous caller. The transcript of the call is as follows:

> OPERATOR: Milwaukee Emergency Operator Number 62. How may I help you?
>
> CALLER: Yes, I'm calling. . .O.K., I don't want to get involved but there's some activity that's going in. . .going around in the back alley of my house where they're selling drugs and everything and I want to know who I can call to report so they can come around here.
>
> OPERATOR: Are they outside or is (unintelligible). . .already. . .dealing from a house or what?
>
> CALLER: They're in the van and they [are] giving customers, you know, drugs.
>
> OPERATOR: Do you have a description of the van?
>
> CALLER: Um, hold on, I can get [it] for you.
>
> OPERATOR: Okay.
>
> CALLER: It's a blue and burgundy Bronco. Hello?
>
> OPERATOR: Okay. A blue and burgundy?

---

[1] The term "9–1–1" refers to emergency assistance telephone number. *See* Wis. Stat. § 146.70 (1995–96). All subsequent references to the Wisconsin Statutes are to the 1995–96 version unless otherwise indicated.

CALLER: Ah hah. Bronco. It's right beside, it's right beside my apartment building.

OPERATOR: Okay. Is it in the alley or is it. . .it

CALLER: It's right in the driveway. Beca. . .ah, I stay at 4261 North Teutonia.

OPERATOR: Um hmm.

CALLER: And we have like this big parking lot on the side of our apartment.

OPERATOR: Okay.

CALLER: And it is right in between the. . .um. . .the parking way and the alley.

OPERATOR: So they're in the driveway?

CALLER: Right. It's a dark blue and burgundy.

OPERATOR: Okay, we'll send someone.

CALLER: Okay. Thank you.

OPERATOR: Thank you. Bye.

¶ 5. The above information was dispatched by radio to Police Officers Johnny Norred and Phillip Henschel, who were driving a general patrol squad car:

OPERATOR: Disrestrict (sic) until further notice.

OPERATOR2: 73R.

SQUAD 73R 73R.

OPERATOR2: 73R drug dealing complaint, 4261 North Teutonia and the alley. Somebody's dealing drugs from a blue and burgundy Ford Bronco that's parked in the driveway on the side of the building. Complaint number is 1119.

SQUAD 73R: 10–4.

¶ 6. Four minutes after receiving the dispatch, the officers arrived at 4261 Teutonia. It was daylight. As they drove past the building, they saw a vehicle matching the general description in the dispatch. The vehicle was a Chevy Blazer instead of a Ford Bronco at the rear, instead of the side, of the building.[2] The Chevy Blazer was parked in an alley or driveway alongside an empty lot behind the building. The officers drove around the block in an attempt to approach the vehicle without being spotted. They conducted no surveillance and observed no drug trafficking.

¶ 7. The officers drove down an alley, and then turned to approach the vehicle so that the front of the police car faced the front of the Blazer. At this point, the officers observed that the Blazer had no license plates.[3] Two persons were sitting in the front seat. Williams was seated in the driver's seat and a female was seated in the passenger's seat.

¶ 8. The officers also observed, as they pulled up, that Williams' right hand was out of view, reaching down and behind the passenger front seat. The officers approached the vehicle, drew their weapons, and told the occupants to put their hands where they could see them. Neither of the occupants was holding weapons. Officer Norred opened the driver's car door and ordered them out of the vehicle. The officers conducted a pat-

---

[2] Williams does not argue that these minor discrepancies impact the determination of whether there was a lawful stop and search.

[3] The testimony from the evidentiary hearing on the suppression motion indicates that there were "no plates." Even though the context of the questioning involves the officers' initial approach to the vehicle, it is unclear from the record at what point the officers observed that the vehicle had no license plates.

down search of each occupant for weapons.[4] Finding none, the officers secured Williams and the passenger in the back seat of the squad car.

¶ 9. Officer Norred returned to the Blazer and searched the area behind the passenger seat where he had observed Williams' hand hidden earlier. Having noted that Williams had long arms, the officer searched wherever Williams could have reached. The officer also searched the area within reach of the passenger's arm.

¶ 10. Within the area that he searched, Officer Norred found a green leafy substance that appeared to be marijuana, a container with 26 rocks he suspected to be cocaine base and another small bag of marijuana. At this point, Williams was placed under arrest.

¶ 11. Williams was charged with knowing possession, with intent to deliver, five grams or less of cocaine, in violation of Wis. Stat. §§ 161.16(2)(b)(1) and 161.41(1m)(cm)(1) (1995–96). Williams moved to suppress the evidence seized as a result of the search, asserting that the officers did not have a search warrant and the circumstances leading up to the search did not provide an exception to the search warrant requirement. On January 10, 1996, the circuit court held an evidentiary hearing on the defendant's motion. The parties stipulated to the admission into evidence of the transcript of the 9–1–1 call and the subsequent dispatch.

¶ 12. In addition, Officer Norred testified that even though he and Officer Henschel took a "concealed route" in approaching the Chevy Blazer, he did not know if Williams had seen them or if Williams had a

---

[4] Officer Henschel conducted a "look" pat-down search of the female passenger occupant, asking her to remove any objects from her pockets and looked at her waistband to check for bulges.

gun in his hand. This prospect made him fear for his safety. Officer Henschel testified that he, too, feared for his safety.

¶ 13. Officer Norred testified that the purpose of his search of the Blazer was to secure his and Officer Henschel's safety. He stated that Williams "may have had a gun in his hands, and he possibly may have dropped it [behind the seat]." Officer Norred explained that "drug dealers have been known to carry guns—and my life is on the line. I don't know if he has a weapon there or not, and I certainly would—felt there was a possibility of danger to myself." He also testified that he would have released Williams and the passenger to return to the vehicle had he not found what appeared to be cocaine base and marijuana.

¶ 14. The circuit court denied the suppression motion, finding that the officers reasonably relied upon the anonymous tip and verified the readily observable information contained in the tip. The circuit court also found that the defendant's hand was behind the passenger seat as the officers approached the vehicle. The court ruled that together, these considerations supported the officers' reasonable suspicion in making the stop and the subsequent protective search of the occupants and the Blazer.

¶ 15. Williams pled guilty. The circuit court entered a judgment of conviction and sentenced Williams to 30 months in state prison.[5] Williams appealed, and the court of appeals reversed the circuit court's ruling. The court of appeals held that the officers could not have had reasonable suspicion in these circum-

---

[5] Judge James Eaton presided over the evidentiary hearing on the motion to suppress and Williams' plea hearing. He also entered the judgment of conviction. Judge Maxine A. White presided over the sentencing hearing.

stances where the anonymous tip "provide[d] only readily observable information, and they themselves observe[d] no suspicious behavior." *State v. Williams*, 214 Wis. 2d at 423. Because the court of appeals concluded that the initial stop was unlawful, it did not reach the issue of whether the subsequent search was lawful. *Id.* at 418, n.6.

¶ 16. We granted review and reversed the court of appeals. We found that the court of appeals focused only upon the anonymous tip, rather than the totality of the circumstances facing the officers at the time of the stop. *State v. Williams*, 225 Wis. 2d at 180. Considering both the quality and quantity of the information known to the officers, and the surrounding circumstances, we held that the officers had the necessary reasonable suspicion for both the investigatory stop and the protective search. *Id.* at 180–81.

¶ 17. As noted above, Williams appealed our decision to the United States Supreme Court. The Supreme Court granted the petition for a writ of certiorari, vacated our decision and remanded for further consideration in light of *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375 (2000). *Williams v. Wisconsin*, 529 U.S. 1050, 120 S. Ct. 1552 (2000).

II

■■■

¶ 18. Whether there is reasonable suspicion that justifies a warrantless search implicates the constitutional protections against unreasonable searches and seizures contained in the Fourth Amendment of the United States Constitution and Article I, Section 11 of

the Wisconsin Constitution.[6] *State v. Martwick*, 2000 WI 5, ¶ 21, 231 Wis. 2d 801, 604 N.W.2d 552. Accordingly, the determination of reasonable suspicion for an investigatory stop and subsequent protective search is a question of constitutional fact. *Id.* at ¶ 19 (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). We apply a two-step standard of review to questions of constitutional fact. First, we review the circuit court's findings of historical fact, and uphold them unless they are clearly erroneous. *Id.* at ¶ 19. Second, we review the determination of reasonable suspicion de novo. *Id.* Accordingly, we apply the two-step standard of review to both of the determinations of reasonable suspicion at issue here: first, whether there was reasonable suspicion for the investigatory stop, and then, whether there was reasonable suspicion for the protective search.

---

[6] The Fourth Amendment to the United States Constitution provides:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, § 11 of the Wisconsin Constitution provides:

> [t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

We ordinarily interpret Article I, Section 11 of the Wisconsin Constitution in accordance with the United States Supreme Court's interpretation of the Fourth Amendment. *State v. Phillips*, 218 Wis. 2d 180, 195, 577 N.W.2d 794 (1998).

## A

¶ 19. In support of its determination that there was reasonable suspicion to stop and detain Williams and his companion, the circuit court made a number of findings of fact. According to the circuit court, the caller was a citizen complaining of overt drug dealing in broad daylight. She was observing a crime in progress.[7] The caller responded to 9–1–1 operator's request for a description of the vehicle with "hold on, I can get it for you" and indicated that the vehicle was right beside the caller's apartment building. The court found that the police officers then confirmed the information from the telephone call. The vehicle's description and location matched the information given by the caller. The officers, in uniform, in a marked police car, in broad daylight, approached the vehicle, and saw that Williams' hand was reaching behind the passenger seat. The court did not, however, find that Williams' gesture was furtive. The circuit court also found the officers' testimony to be credible, including their testimony that they feared for their physical safety upon approaching the vehicle and seeing that Williams' hand was concealed. The court also imputed to them the information in the 9–1–1 call. *State v. Mabra*, 61 Wis. 2d 613, 625–26, 213 N.W.2d 545 (1974).

¶ 20. We do not find the circuit court's findings to be clearly erroneous. The findings are supported by the record, as it was developed at the evidentiary hearing on Williams' motion to suppress.

---

[7] The gender of the anonymous caller was not specifically identified in the record, however, the caller was referred to as a "she" by defense counsel who had listened to the tape recording of the call.

¶ 21. We next determine, upon de novo review of the record before us, whether there was reasonable suspicion. A law enforcement officer may lawfully stop an individual if, based upon the officer's experience, she or he reasonably suspects "that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1 (1968). Wisconsin codified the *Terry* stop standard in Wis. Stat. § 968.24.[8] We determine whether a stop was lawful in light of *Terry* and the cases following it. *State v. Waldner*, 205 Wis. 2d 51, 55, 556 N.W.2d 681 (1996).

¶ 22. In determining whether the police have lawfully conducted a *Terry* stop, we consider the totality of the circumstances. *Alabama v. White*, 496 U.S. 325, 328 (1990). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture,'. . . ." *Id.* at 330, quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981). The totality-of-the-circumstances approach views the quantity and the quality of the information as inversely proportional to each other. "Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if

---

[8] Section 968.24 provides as follows:

> After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

the tip were more reliable." *Id.* Conversely, if the tip contains a number of components indicating its reliability, then the police need not have as much additional information to establish reasonable suspicion.

¶ 23. In considering the totality of the circumstances, however, our focus is upon the reasonableness of the officers' actions in the situation facing them. "The essential question is whether the action of the law enforcement officer was reasonable under all the facts and circumstances present." *State v. Richardson,* 156 Wis. 2d 128, 139–40, 456 N.W.2d 830 (1990).

¶ 24. Here, the circumstances include an anonymous tip, which brings to bear the latest of *Terry's* progeny, *Florida v. J.L.*

¶ 25. In *Florida v. J.L.,*

> [A]n anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. So far as the record reveals, there is no audio recording of the tip, and nothing is known about the informant. Sometime after the police received the tip—the record does not say how long—two officers were instructed to respond. They arrived at the bus stop about six minutes later and saw three black males "just hanging out [there]." One of the three, respondent J.L., was wearing a plaid shirt. Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements. One of the officers approached J.L., told him to put his hands up on the bus stop, frisked him, and seized a gun from J.L.'s pocket.

120 S. Ct. at 1377 (citations to the Petitioner's Appendix omitted).

645

¶ 26. J.L., who was nearly 16 years old at the time, was charged with carrying a concealed weapon without a license and possessing a firearm while under the age of 18. *Id.* J.L. moved to suppress the gun, and the trial court granted the motion. *Id.* The court of appeals reversed, but the Florida Supreme Court quashed that decision, finding that the anonymous tip had no "qualifying indicia of reliability." *Id.* at 1377–78. The Florida Supreme Court also held that no "firearm exception" existed to justify a stop and frisk based upon a "bare-boned anonymous tip[ ]." *Id.* at 1378.

¶ 27. The United States Supreme Court affirmed, holding that "an anonymous tip that a person carrying a gun is, without more, [in]sufficient to justify a police officer's stop and frisk of that person." *Id.* at 1377. The Court concluded that the tip lacked "the indicia of reliability of the kind contemplated in *Adams [v. Williams*, 407 U.S. 143 (1972)] and *White.*" *Id.* at 1380.

¶ 28. The indicia of reliability in *White* related to the predictions contained in the anonymous tip. In *White*, an anonymous call relayed that Vanessa White would be leaving a specific address at a particular time, and would be going to a named motel, carrying cocaine located in a brown attaché case. 496 U.S. at 327. The call also provided a detailed description of the car White would be driving. *Id.* Within the timeframe given by the caller, White departed, without an attach case, and headed towards the motel, where the police stopped her and found the case in her car pursuant to a consensual search. The case contained marijuana; later, the police found that White's purse contained the cocaine. The Court concluded that independent corroboration of the anonymous tipster's predictions

indicated that the tip was reliable. "When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop." *Id.* at 332.

¶ 29. In *Adams*, the tip contained no predictive information, but merely relayed that "an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist." 407 U.S. at 145. However, the tipster was a known informant who personally delivered the tip, and thus could be held accountable if the tip proved false. *Id.* at 146–47.

¶ 30. Comparing the tip before the Court in *Florida v. J.L.*, the Court found none of the indicia of reliability that had existed in either *White* or *Adams*. The tip was from "an unknown, unaccountable informant." *Florida v. J.L.*, 120 S. Ct. at 1379. Indeed, the tip contained only information readily observable by passersby, J.L.'s location—a bus stop, and a very general description—a young black man wearing a plaid shirt. *Id.* at 1377.

¶ 31. However, "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.' " *Id.* at 1378 (quoting *White*, 496 U.S. at 327). *Florida v. J.L.* requires us to examine the indicia of reliability surrounding the tip to determine the quality of the information provided to the police. There are myriad distinctions between the anonymous tip before us and the tip in *Florida v. J.L.*, all indicating that the tip here was reliable.

¶ 32. The tip in *Florida v. J.L.* was a "bareboned" tip about a gun. "All the police had to go on. . .was the bare report of an unknown, unaccounta-

ble informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 1379. Because the tip contained only identifying information that was readily observable, the tip could not, standing alone, establish reasonable suspicion.[9]

¶ 33. In contrast, here, the anonymous tipster explains exactly how she knows about the criminal activity she is reporting: she is observing it. She says, "there's some activity that's going in. . .going around in the back alley of my house. . . . They're selling drugs," and "they [are] giving customers, you know, drugs." She then steps away from the phone momentarily to obtain a description of the vehicle. Quite simply, in contrast to the tipster in *Florida v. J.L.*, the tipster here has made plain that she is an eyewitness.

¶ 34. Also in stark contrast to *Florida v. J.L.*, where nothing was known about the informant—the tip was "from an unknown location by an unknown caller"—the informant here identified her location, 4261 North Teutonia. And, more than merely identifying her location, she repeatedly identified it as her home: "my house," "my apartment building," "our apartment." She also described the immediate surroundings: the alley, the parking lot on the side of her apartment building. Even though the caller did not

---

[9] The tip was particularly insufficient in *Florida v. J.L.* because it alleged concealed criminal activity, carrying a concealed weapon, and yet provided no basis for determining how the tipster knew about the concealed crime. "Such a tip. . .does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375, 1379 (2000).

identify herself, she did provide self-identifying information, that is, her address.

¶ 35. Although the caller said that she did not "want to get involved," by providing self-identifying information, she risked that her identity would be discovered. Consequently, the 9–1–1 caller put her anonymity at risk, contrary to Williams' contention. We agree with the concurrence in *Florida v. J.L.* that if "an informant places his [or her] anonymity at risk, a court can consider this factor in weighing the reliability of the tip." *Florida v. J.L.*, 120 S. Ct. at 1381 (Kennedy, J., concurring).[10] Risking one's identification intimates that, more likely than not, the informant is a genuinely concerned citizen as opposed to a fallacious prankster.[11]

---

[10] The dissent seems to suggest at ¶ 115 that a tipster is reliable only if he or she knowingly or intentionally risks his or her anonymity. There is no authority for such a contention. Where a tipster has reliable and accurate information about ongoing criminal activity he or she observes in a neighborhood, we want to encourage contemporaneous reporting of that activity. Such a person need not intentionally or knowingly put himself or herself at risk by personal identification. We dare not speculate what a caller risks when he or she reports criminal activity observed, but it may be much more than anonymity.

Moreover, it would be difficult, if not impossible, in many instances, for a court to determine whether a tipster has knowingly or intentionally put at risk his or her anonymity by calling a police station and giving identifying information, but not specifically identifying himself or herself.

[11] All indications here point to the conclusion that the 9–1–1 caller was not a prankster. Originally, she had identified the vehicle as a van, but then, after leaving the phone to get a better description, she describes the vehicle as a Ford Bronco. Actually, it was a Chevy Blazer, although, as the officers testified,

¶ 36. In fact, the circuit court found that the caller here was a citizen informant. We have recognized the importance of citizen informants, and, accordingly, apply a relaxed test of reliability, that "shifts from a question of personal reliability to 'observational' reliability." *State v. Boggess*, 110 Wis. 2d 309, 316, 328 N.W.2d 878 (Ct. App. 1982) (citing *State v. Doyle*, 96 Wis. 2d 272, 287, 291 N.W.2d 545 (1980), overruled on other grounds by *State v. Swanson*, 164 Wis. 2d 437, 475 N.W.2d 148 (1991)).[12] In particular, we view citizens who purport to have witnessed a crime

the two vehicles are similar in appearance. That the caller mis-, identified the vehicle as well as left the phone to obtain a more detailed description indicates that clearly the call was not likely rehearsed.

[12] The dissent suggests that a tip from a citizen who contemporaneously witnesses and reports an on-going crime is not entitled to any "relaxed test of reliability" since the U.S. Supreme Court overruled *Aguilar v. Texas,* 378 U.S. 108 (1964) (upon which *State v. Doyle*, 96 Wis. 2d 272, 291 N.W.2d 545 (1980) relies), in *Illinois v. Gates*, 462 U.S. 213 (1983). (Dissent at ¶ 111). This runs counter to the reason that the Court abandoned *Aguilar's* two-pronged test for determining probable cause (and reasonable suspicion) in favor of a totality of circumstances test we use today. "We rejected it as hypertechnical and divorced from 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Massachusetts v. Upton*, 466 U.S. 727, 732 (1984) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Under the totality of the circumstances, the fact that the tip here came from an obviously concerned citizen who was witnessing a crime as she reported it, must be considered. It would be hypertechnical and impractical of us to do otherwise, and, notably, the dissent offers no authority for the proposition that the Court's abrogation of *Aguilar* requires this court to

as reliable, and allow the police to act accordingly, even though other indicia of reliability have not yet been established. *See Doyle*, 96 Wis. 2d at 287.

¶ 37. There are still other distinctions between the tip at hand and in *Florida v. J.L.* In *Florida v. J.L.*, there was no audio recording of the tip. 120 S. Ct. at 1377. Here, there was an audio recording, a transcript of which was admitted at the suppression hearing. The recording adds to the reliability of the tip in a number of ways. It provides a record of the tip and its specific content. It provides an opportunity for review, albeit somewhat limited, of the tipster's veracity, not only based upon content, but also based upon its tone and delivery. The recording would also aid in the event that the police need to find the anonymous caller. "Voice recording of telephone tips might, in appropriate cases, be used by police to locate the caller. . . .[T]he ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips." *Id.* at 1381 (Kennedy, J., concurring).

¶ 38. We note that the call came in on the 9–1–1 emergency services line to a Milwaukee Emergency Operator. According to Wis. Stat. § 146.70(2)(e), Milwaukee may have developed a "sophisticated" emergency phone system.[13] A "sophisticated system" refers to a system with "automatic location identifica-

---

view citizen-witness complaints with a greater degree of suspicion than we have in the past.

[13] Section 146.70(2)(e) provides:

> If a public agency or group of public agencies combined to establish an emergency phone system under par. (d) has a population of 250,000 or more, such agency or group of agencies shall establish a sophisticated system.

tion and automatic number identification."
§ 146.70(1)(i). The record does not indicate that the caller called into the sophisticated 9–1–1 system, or that, if she did, it was fully operational at the time she called. It is noteworthy, however, that the operator did not ask the caller for her address. Instead, the caller volunteered that information.[14] Regardless of whether

[14] There is further support for the inference that the caller's address was automatically identified for the emergency operator in the transcript of the 9–1–1 call. In response to the caller volunteering her address, the operator responded with a confirming "um hmm."

While we applaud the efforts of the concurrence to bolster the majority's opinion, we again note that the record does not clearly establish that there was an operational 9–1–1 system here. Hence, while we wish we could adopt the concurrence's position that this is not an anonymous informant case, there is nothing in the record, and nothing of which we can take judicial notice, which would establish that a sophisticated 9–1–1 system was operating at the time the call came in to the Milwaukee Emergency Operator. *See* Wis. Stat. § 902.01(2): "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (a) generally known within the territorial jurisdiction of the trial court or (b) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Moreover, neither the court nor the parties requested that the court take judicial notice that a sophisticated 9–1–1 system was in operation at the time of the call here. We have established that where a court or a party desires to take judicial notice of a fact, notice should be given to the parties or the adversary, "so as to afford them an opportunity of consulting the same sources or of producing others." *State v. Barnes*, 52 Wis. 2d 82, 88, 187 N.W.2d 845 (1971) (quoting *Fringer v. Venema*, 26 Wis. 2d 366, 373, 132 N.W.2d 565, 133 N.W.2d 809 (1965)).

Nonetheless, we emphasize the content of the 9–1–1 call. The content of that call indicates that the caller volunteered

the caller called into a basic or sophisticated system, she exposed herself to prosecution and penalties for making a false report. § 146.70(10)(a).[15] Potentially, the caller could "be held responsible if her allegations turn[ed] out to [have been] fabricated." *Florida v. J.L.*, 120 S. Ct. at 1378.

¶ 39. The reliability of the anonymous tip here was furthered bolstered by the police corroboration of innocent, although significant, details of the tip. The police, who arrived within four minutes of the dispatch, found the scene much as the 9–1–1 caller described it. The caller correctly identified that there was more than one person in the vehicle. She also accurately described the location of the vehicle, the general description of the vehicle, and the relative layout of the surroundings, the alley/driveway and adjacent empty lot.

¶ 40. We have found previously that "the corroboration by police of innocent details of an anonymous tip" lends credibility to that tip. *Richardson*, 156 Wis. 2d at 142.[16] In addition to asserting criminal activity,

---

identifying information, such as her address, and the relative location of her apartment at that address by describing her view. The caller clearly risked that the police might identify her.

[15] Wisconsin Stat. § 146.70(10)(a) provides:

Any person who intentionally dials the telephone number "911" to report an emergency, knowing that the fact situation which he or she reports does not exist, shall be fined not less than $50 nor more than $300 or imprisoned not more than 90 days or both for the first offense and shall be fined not more than $10,000 or imprisoned not more than 5 years or both for any other offense committed within 4 years after the first offense.

[16] In *Richardson*, an anonymous caller from a public telephone booth informed the police that the defendant would be travelling from Viroqua to La Crosse to sell cocaine. *State v. Richardson*, 156 Wis. 2d 128, 133, 456 N.W.2d 830 (1990). The

the tips in *Richardson*, *White* and *Adams* all relayed details about apparently innocent activities. The police subsequently independently observed these activities, and thus found corroboration for the information contained in the tips. The corroboration also lent reliability to the tips. Consequently, in *Richardson*, for example, we concluded that "when significant aspects of an anonymous tip are independently corroborated by the police, the inference arises that the anonymous informant is telling the truth about the allegations of criminal activity." *Id.* Here, also, there arises an inference that the anonymous caller was telling the truth about the alleged drug trafficking based upon the corroboration of significant details of the tip.[17]

¶ 41. Williams contends, however, that the corroboration of significant aspects of the 9–1–1 call here is not enough. Instead, he argues, the police needed to corroborate the tip's asserted illegal activity to reasonably rely upon the tip. We have specifically rejected a similar argument made in *Richardson*, "that verified details of an anonymous tip must carry with them a degree of articulable, suspicious conduct." 156 Wis. 2d

caller indicated that he had been with the defendant that day and seen the cocaine, and gave a detailed description of the two men involved, including the defendant, the car they would be using, and their expected route. *Id.* The police had not observed any suspicious activity and corroborated only the "innocent details" of the anonymous tip. *Id.* at 135–36.

[17] It is also noteworthy that the officers arrived at the scene four minutes after the dispatch. Consequently, they were able to, nearly contemporaneously, verify details of the anonymous tip. The proximity of the dispatch and the police arrival makes it much less likely that the tip was a prank or otherwise unreliable. The timing here also makes it less likely that there would be an improvident detention.

at 141. There we held that "[t]he corroborated actions of the suspect, as viewed by police acting on an anonymous tip, need not be inherently suspicious or criminal in and of themselves." *Id.* at 142. Also, requiring independent corroboration of the alleged criminal conduct is another way of saying that "reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person." *Adams*, 407 U.S. at 147. The Supreme Court specifically rejected this argument in *Adams*. *Id.* The police officers need not have corroborated the tip's assertion that there was drug dealing here, even, as suggested, by conducting surveillance.[18]

¶ 42. Williams also contends that *Florida v. J.L.* requires that an anonymous tip contain predictive information in order to be reliable. The tips in both *White* and *Richardson* contained predictions; however, it was not the predictions in and of themselves that lent reliability to the tips. Rather, predictions, if they are or are not verified, facilitate an evaluation of the quality of the tip. In *Florida v. J.L.*, the Court indicated that predictions provide one "means to test the informant's knowledge or credibility." 120 S. Ct. at 1379. However, the Court did not mandate that predictions provided the only means to test a tip's reliability. Indeed, "there are many indicia of reliability respecting anonymous tips that we have yet to explore in our cases." *Id.* at

---

[18] The record reflects that surveillance may not have been feasible under the circumstances facing the officers. The officers arrived at the scene during daylight hours. They circled the block to avoid being seen by the individuals in the Chevy Blazer, and to approach it from a concealed route. Simply, the officers likely could not see without also being seen. Consequently, they acted reasonably by not conducting surveillance.

1380–81 (Kennedy, J., concurring). Where other indicia of reliability exist, predictive information is not necessary to test an anonymous tipster's "veracity," "reliability," and "basis of knowledge." *White*, 496 U.S. at 328 (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)).[19]

¶ 43. There is yet another distinction between this case and *Florida v. J.L.*, that relates to the reliability of the anonymous tip here and the totality of circumstances that gave rise to the officers' reasonable suspicion. In *Florida v. J.L.*, the Court noted that there was no visible reason to suspect J.L. or his companions of illegal conduct apart from the tip. *Id.* at 1377. Here, arguably, there are two facts, apart from the anonymous tip, that gave the officers reason to suspect that criminal activity was afoot. First, as the officers approached the Blazer, they observed Williams' hand extended behind the passenger seat. The gesture, though not furtive, may have indicated that Williams was either reaching for a weapon or concealing evidence as he saw the officers' approach.

¶ 44. The dissent's suggestion at ¶ 121 that because Williams' action was not furtive it was unreasonable for the officers to conclude he was reaching for a weapon or concealing evidence, is, in itself, unreasonable. We agree with the circuit court's conclusion that,

---

[19] A rule that requires an anonymous tip to include predictive information would have the untoward effect of undermining citizen complaints. As the *White* Court found, predictive information indicates that the caller has inside information with the alleged criminal's affairs. *Alabama v. White*, 496 U.S. 325, 332 (1990). If predictive information were required, only insiders, as opposed to concerned eyewitness citizens, would have their tips heeded. Such a rule would hardly be conducive to encouraging citizen and police cooperation.

given what the officers observed and could have been facing, the officers acted reasonably:

> It's broad daylight. The officers are dressed in police uniforms operating a marked car. Nothing surreptitious about that. They're approaching from the bow of the defendant's vehicle. They're within easy observation.
>
> Who can tell, given those facts, when Mr. Williams began his reach.
>
> But, in any case, there was a reach. His arm was extended. We don't know precisely when he extended it, but his arm was extended behind the passenger van or the passenger seat. . . .
>
> I will tell counsel and I'll tell the appellate court that, recently, the court had an opportunity to see just how acute an officer's fear can be about having themselves put upon or their life taken. I think, when I balance the officers' concern for their safety against the possibility that they're going to suffer bodily harm, grievous bodily harm or death, if they guess wrong, or if they determine wrongly, that it's better to—to be thorough.

(R. at 22:59–60.)

¶ 45. Second, the Blazer had no license plates. Although the lack of plates was not specifically developed or relied upon by the circuit court, we consider instead whether the officers relied upon that fact.[20] As noted above, the record is unclear on this point. Accordingly, we do not solely rely upon the absence of the plates to justify the stop.[21] *See State v. McGill*, 2000 WI 38, ¶ 15 n.2, 234 Wis. 2d 560, 609 N.W.2d 795.

---

[20] One of the officers noted that the Blazer had "no plates," and so testified at the suppression hearing. The issue came up during questioning about the officers' approach of the vehicle.

[21] The absence of license plates alone can reasonably justify a stop because, without investigation, the police are unable to

¶ 46. Williams contends that the police could not reasonably rely upon either the outstretched arm or the lack of license plates because innocent explanations exist. Nonetheless,

> [P]olice officers are not required to rule out the possibility of innocent behavior before initiating a brief stop. . . . [I]f any reasonable inference of wrongful conduct can be objectively discerned, notwithstanding the existence of other innocent inferences that could be drawn, the officers have the right to temporarily detain the individual for the purpose of inquiry.

*State v. Griffin*, 183 Wis. 2d 327, 333, 515 N.W.2d 535 (Ct. App. 1994) (quoting *State v. Anderson*, 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990)).

¶ 47. In *Florida v. J.L.*, the Supreme Court held that "an anonymous tip that a person carrying a gun is, *without more*, [in]sufficient to justify a police officer's stop and frisk of that person." 120 S. Ct. at 1377 (emphasis added). Here, there is plainly so much more than a "bare-boned" tip. *Id.* at 1380. The information upon which the police proceeded was substantial in both quality and quantity. The anonymous tip was supported by a wide array of indicia of

---

determine whether the vehicle is stolen or otherwise properly registered. *See State v. Griffin*, 183 Wis. 2d 327, 329, 515 N.W.2d 535 (Ct. App. 1994); *see also* Wis. Stat. § 341.04 (prohibits operation of a motor vehicle without registration or pending application for registration); § 341.15(3) (requires display of registration plates).

Nonetheless, we do not suggest, as the dissent contends (at ¶ 123), that the officers here were investigating a traffic violation.

reliability—contemporaneous eyewitness account accompanied by details promptly verified by the police. A reliable tip, such as this one, provided information of substantial quality. Added to that was information of not insignificant quantity—a vehicle parked in an alleyway in broad daylight with no plates, containing two persons, one of whom was reaching behind the passenger's seat upon the police's arrival. Accordingly, consideration of the totality of circumstances compels the conclusion that the officers' acted reasonably in deciding to detain Williams. We have here the necessary "cumulative detail, along with reasonable inferences and deductions which a reasonable officer could glean therefrom, [that] is sufficient to supply the reasonable suspicion that crime is afoot and to justify the stop." *Richardson*, 156 Wis. 2d at 142.[22] We therefore conclude that the State has met its burden of showing that the investigatory stop of Williams was justified—that there was reasonable suspicion.[23]

[22] However,

"we do not attempt to assign a definitive number of details or list the types of detail that would give rise to reasonable suspicion under these circumstances. The analysis of reasonableness of an officer's reliance upon the corroborated, innocent details of an anonymous tip is necessarily governed by the unique facts and circumstances of the given case."

*Richardson*, 156 Wis. 2d at 143 n.5.

We also reject the dissent's suggestion at ¶¶ 115–117 that the only reliable tips are from persons who are "intimate with the suspect's affairs." (Dissent at ¶ 117.) If that were the case, only those who associate with alleged criminals, rather than citizen informants, could provide reliable tips.

[23] Because we conclude that the anonymous tip here has sufficient indicia of reliability, and that, combined with the officers' other observations, gave rise to reasonable suspicion, we need not consider whether there was imminent danger due

## B

¶ 48. We next determine whether the protective search of the Chevy Blazer that followed the stop was justified. The Supreme Court noted in *Florida v. J.L.* that its holding "in no way diminishes a police officer's prerogative, in accord with *Terry*, to conduct a protective search of a person who has already been legitimately stopped." 120 S. Ct. at 1380. The circuit court found that the officers feared for their physical

to drug dealing, akin to firearm possession, to otherwise support a finding of reasonable suspicion as we considered in our previous decision. *State v. Williams*, 225 Wis. 2d 159, 178–80, 591 N.W.2d 823 (1999). In *Florida v. J.L.*, the Supreme Court directed us not to pursue such a path, insofar as the Court refused to create a "firearm exception;" that is, where the tip alleged the possession of a firearm and otherwise lacked the requisite indicia of reliability, that allegation alone would justify an investigatory stop and protective search.

> If police officers may properly conduct *Terry* frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain. . .that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability critical in *Adams* and *White,* the Fourth Amendment is not so easily satisfied. *Cf. Richards v. Wisconsin,* 520 U.S. 385, 393–94. . .(1997) (rejecting a *per se* exception to the "knock and announce" rule for narcotics cases partly because "the reasons for creating an exception in one category [of Fourth Amendment cases] can, relatively easily, be applied to others," thus allowing the exception to swallow the rule).

*Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375, 1379–80 (2000). Accordingly, we no longer rely upon *United States v. Clipper*, 297 U.S. App. D.C. 372, 973 F.2d 944 (D.C. Cir. 1992), *cert. denied*, 506 U.S. 1070 (1993), and other similar cases which suggested a *per se* rule, and note, as the Supreme Court did, that these cases directly conflict with the Florida Supreme Court's decision that the United States Supreme Court affirmed in *Florida v. J.L.* 120 S. Ct. at 1378.

safety based upon the circumstances at hand, and so testified credibly. These findings are supported by the record and thus, are not clearly erroneous. Accordingly, we view those facts de novo to determine whether there was reasonable suspicion for the protective search. *Martwick*, 2000 WI 5 at ¶ 19.

¶ 49. Wisconsin has codified the *Terry* standard for protective searches in Wis. Stat. § 968.25, and, as with the *Terry* stop standard, we follow those cases interpreting *Terry*. Section 968.25 provides in pertinent part:

> When a law enforcement officer has stopped a person for temporary questioning pursuant to s. 968.24 and reasonably suspects that he or she or another is in danger of physical injury, the law enforcement officer may search such person for weapons or any instrument or article or substance readily capable of causing physical injury and of a sort not ordinarily carried in public places by law abiding persons.

¶ 50. In *State v. Moretto*, 144 Wis. 2d 171, 174, 423 N.W.2d 841 (1988), we held that Wis. Stat. § 968.25 "permits an officer to search the passenger compartment of a vehicle for weapons where the individual who recently occupied the vehicle is stopped for temporary questioning under sec. 968.24, and the officer 'reasonably suspects that he or another is in danger of physical injury.'" Such a search is justified as a preventive measure to ensure that there are no weapons that could be used against the police officers once those detained are allowed to reenter their vehicle. *Id.* at 187.

¶ 51. Here, the officers approached the vehicle, and observed that Williams had his arm extended and

his right hand behind the passenger car seat. It was broad daylight, the officers arrived in a marked squad car, in full uniform. In addition, as Officer Norred testified, "drug dealers have been known to carry guns." Both officers testified that they feared for their safety. After finding no weapon on Williams, Officer Norred suspected that Williams had dropped or hid a weapon while his hand was concealed. Consequently, he searched the passenger compartment, having noted that Williams had long arms.

¶ 52. The concern that Williams may have dropped or hid a weapon is significant because the officers intended to release Williams and the passenger to return to the Blazer after the investigatory detention. The two vehicles were apparently nose to nose in an alley, or alley-like driveway. Had Williams and his companion been released to return to the Chevy Blazer, the officers would have been in the vulnerable position of having to back out of the alley from whence they came. Indeed, the entire situation rendered the officers particularly vulnerable. Because "a *Terry* investigation. . .involves a police investigation 'at close range,'. . .when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger. . . .'" *Moretto*, 144 Wis. 2d at 180 (quoting *Michigan v. Long*, 463 U.S. 1032, 1050–1052 (1983).

¶ 53. Contrary to Williams' contention, the scope of the *Terry* search here was " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19 (quoting *Warden v. Hayden*, 387 U.S. 294, 310 (1967) (Fortas, J., concurring)). The justifying circumstances here are not, as Williams argues and the dissent suggests, drug dealing

*per se*. Instead, the pertinent circumstance is that the officers intended to release Williams and the passenger to reenter the vehicle. Consequently, in order to protect themselves—especially in light of the fact that Williams' hand had been extended behind the passenger seat when they arrived—there was a search of the passenger compartment.

¶ 54. These same circumstances rebut Williams' contention that, by finding there was reasonable suspicion here, we will create a categorical exception to the warrant requirement based upon a connection between drugs and weapons. Williams relies upon the Supreme Court's statement in *Richards v. Wisconsin*, 520 U.S. 385, 393 (1997), that "while drug investigation frequently does pose special risks to officer safety. . .not every drug investigation will pose these risks to a substantial degree." However, that the officers were responding to a drug complaint is not the only reason to justify the protective search here. The more compelling reason is that Williams' hand was concealed from view when the officers approached. This alone distinguishes this case from *Richards*.[24]

¶ 55. In view of the particularly vulnerable situation facing the officers here, we conclude that the officers acted reasonably. The officers reasonably suspected that they were in danger of physical injury and the circumstances warranted their search of the vehicle. Accordingly, the State has met its burden of showing that the protective search was justified.

[24] We have appropriately applied *Richards* where appropriate. *See State v. Meyer*, 216 Wis. 2d 729, 576 N.W.2d 260 (1998).

## III

¶ 56. We hold that the officers had the requisite reasonable suspicion to detain Williams in consideration of the totality of the circumstances. Those circumstances include the anonymous tip, viewed in light of the Supreme Court's recent decision, *Florida v. J.L.*, and the police officers' additional observations of Williams' hand extended behind the passenger seat upon the officers arrival, and the absence of license plates on the suspects' vehicle.

¶ 57. We further hold that the subsequent protective search was valid. The officers were reasonable in fearing for their safety and executed a limited search of the vehicle to quell that fear. We therefore reverse the court of appeals and uphold the judgment of conviction.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 58. DAVID T. PROSSER, J. *(concurring)*. We are asked in this case to determine whether two police officers had reasonable suspicion to make an investigatory stop of the defendant and his companion as they sat in the front seat of a blue and burgundy-colored automobile parked behind an apartment building at 4261 North Teutonia Avenue in Milwaukee. We know that the officers did not arrive at this site by happenstance. They were responding to an informant's tip that "they're selling drugs" out of a blue and burgundy vehicle behind her apartment. Thus, the issue presented is "whether the tip, as corroborated by independent police work, exhibited sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Alabama v. White*, 496 U.S. 325,

326–27 (1990). I join the mandate of the court but write separately because I do not believe this case should be analyzed as an anonymous informant case.

¶ 59. Several cases discussed in the majority opinion involve police informants who were totally anonymous. In *White*, the Montgomery Police Department "received a telephone call from an anonymous person." *Id.* at 327. The date was April 22, 1987. *Id.* In *State v. Richardson*, 156 Wis. 2d 128, 133, 456 N.W.2d 830 (1990), the La Crosse Police Department received an anonymous telephone call from a public telephone booth. The date was November 4, 1988. In *Florida v. J.L.*, 529 U.S. 266, 268 (2000), the Miami-Dade Police received a tip from an "anonymous caller" who made a call from an unknown location. The date was October 13, 1995. *Id.*

¶ 60. Police officials knew nothing about the identity of the three informants in these cases. Hence, the reliability of the tips they received depended upon the richness of the detail provided by the informants, the bases of their information, and the corroboration of at least some of the detail through police investigation.

¶ 61. The Supreme Court explained in *White* why anonymous tips must be treated with great caution:

> The opinion in [*Illinois v. Gates*, 462 U.S. 213 (1983)] recognized that an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is "by hypothesis largely unknown, and unknowable." This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for a *Terry* stop.

665

*White*, 496 U.S. at 329 (citation omitted). The Court then concluded that when an anonymous tip provides virtually nothing to show that the tipster is honest or that the tipster's information is reliable (including the basis of the tipster's information), "something more" is required before reasonable suspicion is established. *Id.* (quoting *Gates*, 462 U.S. at 227).

¶ 62. The Court was satisfied in *White* that the tip and its partial corroboration established reasonable suspicion. *Id.* at 332. The anonymous caller spelled out in some detail that Vanessa White would follow a particular course of conduct at a specific time as she headed toward a particular destination carrying cocaine. Several of these predictions were thereafter confirmed through surveillance. The Court was impressed not only with the tip's "range of details" relating to easily obtained facts but also the prediction of future activities "not easily predicted." *Id.* "What was important," the Court said, "was the caller's ability to predict respondent's *future behavior*, because it demonstrated inside information—a special familiarity with respondent's affairs." *Id.*

¶ 63. When the Supreme Court took up *Florida v. J.L.*, it was confronted with a fact situation involving an anonymous informant but no predicted future activities. Hence, the question was "whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person." *Florida v. J.L.*, 529 U.S. at 268. The Court held that it was not. *Id.* The Court determined that the additional information required in these circumstances was information "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272. The Court cited Professor LaFave, stressing "reliability as to the likelihood of criminal

activity, which is central in anonymous-tip cases." *Id.* at 272 (citing 4 Wayne R. LaFave, *Search and Seizure* § 9.4(h), at 213 (3d ed. 1996)).

### 911 caller

¶ 64. Two years ago, I argued that this case is not governed by the analysis above because it is not an anonymous informant case. *State v. Williams*, 225 Wis. 2d 159, 189–93, 591 N.W.2d 823 (1999) (Prosser, J., concurring), *vacated by Williams v. Wisconsin*, 529 U.S. 1050 (2000). It is not an anonymous informant case because the informant made a 911 call in an "enhanced" 911 system. Hence, "[t]he police knew the caller's identity or could easily have discovered it because of the information provided by 911." *Id.* at 189. Thus, this case is close to the Court's decision in *Adams v. Williams*, 407 U.S. 143 (1972), in which the tip was not reliable in its assertion of illegality but the informant, the source of the tip, increased his reliability by putting himself at risk inasmuch as his identity was clearly known.

¶ 65. My colleagues appear unwilling to draw upon the dramatic technological advances in modern law enforcement because those advances are not fully documented in the record. By contrast, I am willing to take judicial notice of facts that are beyond dispute, recognizing that the enhanced 911 system in effect in Milwaukee County in late 1995 was not in effect in all other areas at that time, or even now.

¶ 66. In 1978, the Wisconsin legislature approved legislation establishing a statewide emergency services telephone number, 911. Ch. 392, Laws of 1977 (effective May 29, 1978). The legislation defined "automatic location identification" as a "system which has the ability to automatically identify the address of

667

the telephone being used by the caller and to provide a display at the central location of a sophisticated system." § 3, ch. 392, Laws of 1977 (creating Wis. Stat. § 146.70(1)(a)). The legislation defined "sophisticated system" as "a basic system with automatic location identification and automatic number identification." § 3, ch. 392, Laws of 1977 (creating Wis. Stat. § 146.70(1)(i)).

¶ 67. According to a 1997 audit by the Legislative Audit Bureau, "[a]s of May 1997, an estimated 94 percent of the State's population was receiving 9–1–1 service from one of 121 answering points being operated in the 57 counties that provide 9–1–1 service." State of Wisconsin Legislative Audit Bureau, *A Best Practices Review: 9–1–1 Services* 3 (July 1997). The audit indicated that 105 of the 121 answering points operated an "enhanced 9–1–1 system," which automatically identifies and displays the caller's telephone number and location. *Id.* at 4. The "sophisticated system" defined in the statutes and the enhanced system referred to in the audit are the same thing.

¶ 68. The 1997 audit states that Milwaukee County has had an enhanced system since 1989. *Id.*, Appendix III, at 2. Establishment of an enhanced system was preceded by a county-wide referendum on 911 services in November 1986. "By nearly 8 to 1, voters said in a referendum that they wanted [Milwaukee] County to establish a 911 system, which automatically records a caller's telephone number and address at a central dispatch location, even if the caller cannot speak." *911 System Wins Big in County Referendum*, Milwaukee Journal, Nov. 5, 1986, at 3B.

¶ 69. Today, an enhanced system normally provides authorities with (1) the telephone number of the telephone from which an incoming call is made, (2) the

668

address of the residence or place of business where an incoming call is made, and (3) the name of the person or place of business to whom the telephone in question is registered. The third feature is equivalent to "Caller ID with Name." Because Milwaukee County had an enhanced 911 system beginning in 1989, it unquestionably was recording the phone number and address of incoming calls in late 1995.[1] Whether the system also included a "Caller ID with Name" feature in 1995 has not been documented, but the 1995 Milwaukee telephone directory offered "Caller ID with Name" to residential customers, *Ameritech Milwaukee Telephone Directory 1995–96* (Nov. 1995), at 6, and the *1995 Annual Report of the Milwaukee County Sheriff* states that in 1995 "[p]rovisions were made to modernize communications to include. . .state-of-the-art communications equipment, new and improved radio consoles, and upgraded communications support equipment." *1995 Annual Report of the Milwaukee County Sheriff*, at 39.

¶ 70. My reading of the evidence is that when the police dispatcher received the 911 call in this case, he or she knew at a minimum the address and telephone number of the caller. Moreover, the call was recorded. This means that the police had on tape the voice of the person making a 911 telephone call from a specific address at a specific time. This caller cannot be

---

[1] At the time of this incident, cellular phone calls did not provide this information. When such calls were received, the dispatcher would have to ask the caller for identification if such information were not offered. State of Wisconsin Legislative Audit Bureau, *A Best Practices Review: 9–1–1 Services* 7 (July 1997). The dispatcher in this case did not ask for any form of identification or location. The caller did not volunteer her home address until well into the conversation.

described as an anonymous informant in the same sense as the callers in *White, Richardson,* and *J.L.*

¶ 71. The transcript of the call reveals that the dispatcher never asked the caller's name, address, or telephone number, implying that the dispatcher already knew most of this information. Drawing this inference is reasonable because the dispatcher replied "Um hmm" when the caller *voluntarily* disclosed that "I stay at 4261 North Teutonia."

¶ 72. As the majority opinion skillfully observes in ¶ 34, the caller used the terms "my house," "my apartment building," and "our apartment" in addition to the statement "I stay at 4261 North Teutonia." Had the incoming call been made from an address different from 4261 North Teutonia, the dispatcher would likely have asked the caller for an explanation.

¶ 73. The dispatcher did ask whether the caller had a description of the van, and the caller replied: "Um, hold on, I can get for you." Thereafter, the caller returned to the phone and gave a more detailed description of the vehicle. The color of the vehicle, the location of the vehicle, and the fact that more than one person was in the vehicle were either described or alluded to by the caller and later confirmed by the investigating officers. The caller reported as a contemporaneous eyewitness and answered all questions asked by the dispatcher.

¶ 74. The recorded call and its subsequent transcript show both the caller's basis of information and the caller's reliability. The fact that the police agency either knew the identity of the caller or had the means to discover the caller's identity enhances the caller's credibility. The police were in a position to go back to their source. If the information provided had turned out to be untrue, the police would have been able to

670

follow up and confront the caller, demand an explana-
tion, and pursue criminal charges.

¶ 75. It is a violation of Wis. Stat. § 946.41(1) to
"obstruct[ ]" a police officer by "knowingly giving false
information to the officer. . .with intent to mislead the
officer in the performance of his or her duty." Wis. Stat.
§ 946.41(2)(a).[2] This is the type of statute applauded by
the Supreme Court in *Adams v. Williams*, 407 U.S. at
147 (citing Conn. Gen. Stat. § 53–168 and stating "the
informant might have been subject to immediate arrest
for making a false complaint had [the officer's] investi-
gation proved the tip incorrect").

¶ 76. From the outset, officials understood the
possibility that the 911 system could be used to make
false reports. The legislature created a monetary pen-
alty for false reports in the initial legislation. § 3, ch.
392, Laws of 1977. The legislature added criminal pen-

---

[2] *State v. Griffith*, 2000 WI 72, ¶ 65, 236 Wis. 2d 48, 613
N.W.2d 72 ("[I]f a passenger chooses to answer [police question-
ing] but gives the officer false information, the passenger can be
charged with obstructing an officer in violation of Wis. Stat.
§ 946.41(1)."); *Peters v. State*, 70 Wis. 2d 22, 29, 233 N.W.2d 420
(1975) ("[T]he statute permits conviction for obstruction of an
officer under circumstances where efforts to intentionally mis-
lead an officer may be involved. . . ."); *State v. Caldwell*, 154 Wis.
2d 683, 688, 454 N.W.2d 13 (Ct. App. 1990) (Section 946.41(2)
"embodies a legislative determination that 'knowingly giving
false information to the officer with intent to mislead him in the
performance of his duty' constitutes an 'obstruction' as a matter
of Wisconsin law."); *see also* Wis—JI Criminal 1766A (entitled
"Obstructing an Officer: Giving False Information"); Wis—JI
Criminal 1766 ("To obstruct an officer" is the first element of
this offense, which "means that the conduct of the defendant
prevents or makes more difficult the performance of the officer's
duties").

alties in 1987. 1987 Wis. Act 27, § 1836gr. In 1995, Wis. Stat. § 146.70(10)(a) (1995–96) read:

> Any person who intentionally dials the telephone number "911" to report an emergency, knowing that the fact situation which he or she reports does not exist, shall be fined not less than $50 nor more than $300 or imprisoned not more than 90 days or both for the first offense and shall be fined not more than $10,000 or imprisoned not more than 5 years or both for any other offense committed within 4 years after the first offense.

A criminal penalty for false reporting in a 911 call existed for eight years before the 911 call in this case.

¶ 77. The enhanced 911 system increased the likelihood of enforcing these penalties. Leverett F. Baldwin, the former emergency government services director of Milwaukee County, now Milwaukee County Sheriff, said in 1988 that the new 911 system was expected to eliminate most prank calls because the caller's telephone number and address would be recorded and would be easy to track down. Ralph D. Olive, *Single Number May Call for Help*, Milwaukee Journal, Jan. 18, 1988, at 3B.

¶ 78. Florida has a criminal penalty for false 911 calls similar to that of Wisconsin. In *United States v. Gibson*, 64 F.3d 617, 625 (11th Cir. 1995), the court observed: "The state of Florida provides a significant deterrent against reporting false information to its law enforcement agencies and officers by making such acts punishable by law. Fla. Stat. Ann. § 365.171(16) (West 1995) (false '911' calls); *Id.* § 817.49 (false reports of commission of crimes to law enforcement officers). *This deterrent increases the odds that an anonymous tip is legitimate.*" (Emphasis added.) Justice Anthony Ken-

nedy cited the Florida statutes in his concurrence in *Florida v. J.L.*, declaring:

> Instant caller identification is widely available to police, and, if anonymous tips are proving unreliable and distracting to police, squad cars can be sent within seconds to the location of the telephone used by the informant. Voice recording of telephone tips might, in appropriate cases, be used by police to locate the caller. It is unlawful to make false reports to the police. . .and the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips.

*Florida v. J.L.*, 529 U.S. at 276 (Kennedy, J., concurring).

¶ 79. Professor LaFave argues that this analysis is insufficient:

> [I]t seems that the *Williams* concurrence ends one step short; it stresses that the police were aware of these characteristics of their 911 system, but surely that in and of itself is unimportant, for if the *Williams* caller deserves to be viewed as not anonymous and thus more reliable than the *White* informant, then surely the question is the *informer's* perception that his or her identity could easily be determined by the police and that false information might lead to criminal prosecution. And thus the ultimate question. . .is whether in the locale in question there exists such widespread public awareness of the characteristics of the 911 system and of criminal sanctions for false information that it is permissible for the police to presume that each 911 caller possesses such information.

4 LaFave, *Search and Seizure* § 9.4(h), at 64 (Supp. 2001) (footnote omitted).

¶ 80. This analysis deserves a response in the factual context of this case.

¶ 81. First, a Milwaukee resident observed what she thought was criminal conduct in progress in an alley behind her apartment building. She picked up the telephone to inform police, dialing the emergency number (911) provided in bold three and five-sixteenths inch type on the inside front cover of her telephone book.[3] She reported her conclusions to a dispatcher. She answered all the questions posed by the dispatcher and voluntarily offered her address. Normally, we commend this sort of conscientious conduct on the part of a citizen.

¶ 82. Second, the dispatcher believed the caller. The dispatcher had the opportunity to hear the caller's voice. The dispatcher asked questions and received direct, polite answers. The dispatcher confirmed that the caller was calling from the address she said she was. The dispatcher then radioed Squad 73R with the succinct message that "somebody's dealing drugs from a blue and burgundy Ford Bronco" in an alley at 4261 North Teutonia. The public expects a dispatcher like Emergency Operator 62 to make an immediate good faith judgment in response to a 911 telephone call, whether the issue at hand is a health emergency, a fire, or a crime in progress. That is what this dispatcher did. The dispatcher's performance was reasonable.

¶ 83. Third, the two officers sent to North Teutonia did not know the source of the drug complaint. They were not able to interrogate the caller. They were required to rely upon the dispatcher, quickly

---

[3] *Ameritech Milwaukee Telephone Directory 1995–96* (Nov. 1995).

674

follow up the complaint, and attempt to corroborate the information as best they could. The officers proceeded to the site and confirmed that a blue and burgundy vehicle was parked in an alley behind 4261 North Teutonia. They saw the vehicle "from quite a distance" but ran the risk of being seen themselves if they stopped to observe. Consequently, they drove around the block and approached the vehicle cautiously for further investigation. This conduct was reasonable. The officers did exactly what the public expected them to do.

¶ 84. This case, then, raises important issues about the operation of the 911 system as well as issues about search and seizure. Today, there is widespread public understanding of the 911 system. "In our modern society we are trained, almost from birth, that we should telephone 911 to summon help in the event of a medical emergency." Jeffrey D. Hickman, Note, *It's Time to Call 911 for Government Immunity*, 43 Case W. Res. L. Rev. 1067, 1067 (1993). "It is estimated that 99% of adult Americans living in an area serviced by a 911 system know to dial 911 in the event of an emergency; even children as young as three years old can be trained to dial 911." *Id.* at n.2 (citing David Foster, *'Help Officer, My Soufflé is Falling . . .' Non-Emergencies Clog 911 Lines*, L.A. Times, Mar. 15, 1992, at A1).

¶ 85. In Wisconsin the Department of Public Instruction has for years encouraged public schools to train children to use 911 for emergency referrals, beginning in the first grade. Wisconsin Department of Public Instruction, *A Guide to Curriculum Planning in Health Education*, Table 1 (Curriculum Progress Chart) (1985). The Department recommends that young children go through the experience of dialing the emergency phone number. Moreover, the Department

675

suggests that students in fourth grade develop a list of telephone numbers for emergency contacts. *Id.* This kind of early training is not likely confined to Wisconsin, and, along with parental instruction, explains the remarkable stories of small children calling 911 to report fires, crimes, and health emergencies.

¶ 86. The emergency number 911 has become ingrained in our popular culture.[4] For example, it was featured in a nationally syndicated television program, *Rescue 911,* which aired weekly on the CBS television network in the early 1990s and once ranked twelfth in the Nielsen ratings.[5] A special report in Ladies' Home Journal in 1995 asserted that *Rescue 911* "has probably done more than anything else to raise our expectations of what would happen should *we* have to call the nationally recognized emergency number." Paula Lyons, *Before You Call 911: Is the Emergency Number the Lifesaver It Should Be?*, 112 Ladies' Home J. 60 (May 1995). "Every state—though not every region in each state—has systems (called enhanced 911) that automatically provide the dispatcher with the caller's

---

[4] The rap music group "Public Enemy" scored a hit with a single entitled *911 Is a Joke* on an album that reached the top ten Billboard album chart in 1990. *See* Neil Drumming, *Public Enemy, in 20th Century A. . .Z, at http://www.billboardonline.com/atoz/p/publicenemy.asp* (last visited Mar. 8, 2001). *911 Is a Joke* criticized officials for alleged slow response time to 911 calls. *See* Public Enemy, *911 Is a Joke, on Fear of a Black Planet* (Def Jam Records 1990) (lyrics *available at* http://www.public-enemy.com/lyrics/lyrics/911-is-a-joke.php) (last visited Mar. 8, 2001). Unresponsive 911 systems have been sued. *See, e.g., Chicago Pays $825,000 To Estate of Woman Who Died After 911 Responded Late*, 83 Jet 24 (April 12, 1993).

[5] *See Nielsen Ratings 1990–1995, at http://www.angelfire.com/ny2/televisioncity/9095.html* (last visited Mar. 8, 2001).

phone number and address, through a device similar to caller I.D." *Id.* at 66.

¶ 87. Public knowledge of 911 emergency calls was reinforced in the murder trial of O.J. Simpson. Simpson was charged with murdering his former wife Nicole Brown Simpson and Ronald Goldman on June 12, 1994. The case was the subject of unprecedented national exposure and television coverage until Simpson was found not guilty on October 3, 1995. One of the key pieces of evidence in the case was the tape of a 1993 911 telephone call from Nicole Brown Simpson to police reporting domestic abuse. The tape was repeatedly discussed and played during the lengthy proceedings.[6]

¶ 88. One of O.J. Simpson's attorneys, Gerald Uelmen, described the initial appearance of the tape in his book, *Lessons From The Trial* 21 (1996):

> On Wednesday, June 22, two days after Simpson's arraignment, the airwaves were filled with explosive excerpts from 911 emergency telephone calls made to police by Nicole Brown Simpson in both the 1989 incident and an October 1993 incident in which Simpson broke down a door. Every television news broadcast in America led off with audio recordings of the calls, with a rolling transcript and photos and video clips of Nicole Brown Simpson. Her sobbing voice was heard saying, "he's back," "I think you know his record," and "he's crazy." The 911 tapes had the desired effect. Before they were aired, public opinion polls were reporting that more than 60 percent of the American population thought Simpson was probably innocent. After the 911 tapes, the polls showed that 60 percent thought that

[6] Marcia Clark & Teresa Carpenter, *Without a Doubt* 79 (1997); Christopher A. Darden & Jess Walter, *In Contempt* 365 (1996); Jeffrey Toobin, *The Run of His Life* 262 (1996).

he was probably guilty. The only problem, of course, was that the admissibility of the tapes as evidence was yet to be determined, and the only potential jurors who hadn't heard the tapes at least a half dozen times were those who lived in caves or trees.

¶ 89. The 911 call in this case occurred less than one month after the conclusion of the O.J. Simpson trial. One would be hard pressed to argue that by November 1995 the overwhelming majority of the American people did not understand that a 911 call is recorded and that it usually provides information about the source of the call. In any event, the caller here voluntarily gave her address. It would also be hard to argue that Wisconsin citizens do not understand that they are not free to initiate false statements to 911 dispatchers without suffering adverse consequences. The 911 system enjoys substantial public support. It is a system that citizens expect to depend upon in their own emergencies. It is not a system that a thinking person would seek to undermine. Milwaukee police were entitled to presume in 1995 that 911 callers knew how the 911 system worked and that they could not make false calls to 911 without risking prosecution.

¶ 90. The question of whether this investigatory stop was supported by reasonable suspicion is not an overly technical exercise. *Richardson*, 156 Wis. 2d at 140. Rather, it is a question about "common sense," *id.* at 139 (citation omitted), "along with reasonable inferences and deductions which a reasonable officer could glean" from "the cumulative detail" of this situation. *Id.* at 142. Leaning firmly on a 911 tip, with all its attendant ability to identify callers, was entirely reasonable and within common sense in the "cumulative detail" of this case.

absence of license plates

¶ 91. When they arrived at the scene and spotted the vehicle, Officers Johnny Norred and Phillip Henschel drove past the apartment building and then turned west on Roosevelt Drive. Eventually, they entered the alley at the point where they thought their squad car would be concealed. They drove through the alley, coming up to the front of a Chevy Blazer. There was no front license plate on the vehicle.

¶ 92. Like 29 other states and the District of Columbia, Wisconsin requires two license plates on a motor vehicle.[7] For more than 20 years, there have been efforts in the Wisconsin legislature to move from two license plates to one license plate. According to the Legislative Fiscal Bureau, "the major objection to the single license plate proposal has been expressed by law enforcement officials. They contend that the front license plate has value because it allows identification of oncoming and parked vehicles."[8]

¶ 93. In this case, there were no plates on the automobile. Under the circumstances, the primary concern of the officers would have been identifying the vehicle, not ticketing the driver for a motor vehicle violation. From the point of view of the officers, the suspected drug vehicle had been stripped of the standard means of identifying it. The absence of license plates added to the evidence which permitted the officers reasonably to conclude in light of their training

[7] *See* Wis. Stat. §§ 341.12(1) and 341.15(1). *See also* American Association of Motor Vehicle Administrators, *The Fast Track to Vehicle Services Facts, A Motor Vehicle Regulations and Procedures Information Guide* 83 (1999).

[8] Cheryl McIlquham, State of Wisconsin Legislative Fiscal Bureau, Issue Paper #864, 1997–99 Budget, *Single License Plate* 2 (May 22, 1997).

and experience that criminal activity might be afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

¶ 94. Police routinely view missing plates as unusual enough to warrant attention. *See United States v. Sowers*, 136 F.3d 24 (1st Cir. 1998) (missing front plate and troubled exhaust system led officer to stop car found to contain cocaine); *United States v. Murray*, 89 F.3d 459 (7th Cir. 1996) (missing rear license plate led police to stop driver found to have crack cocaine and handgun within car); *United States v. Mitchell*, 82 F.3d 146 (7th Cir. 1996) (missing front plate led officer to investigate driver found to have a loaded semi-automatic pistol inside vehicle within easy reach); *United States v. Faulkner*, 488 F.2d 328 (5th Cir. 1974) (sufficient nexus found between stop for missing front plate and police discovery of counterfeit bills in vehicle); *United States v. Scott*, 878 F. Supp. 968 (E.D. Texas 1995) (stop based on lack of visible license plate reasonable); *United States v. $64,765,000 in United States Currency*, 786 F. Supp. 906 (D. Ore. 1991) (missing plate on parked vehicle constituted reasonable suspicion for *Terry* stop); *People v. Ryan*, 672 N.E.2d 47 (Ill. App. Ct. 1996) (missing front plate prompted stop in which driver was found to be transporting marijuana); *People v. Williams*, 640 N.E.2d 981 (Ill. App. Ct. 1994) (missing front plate led to legal stop); *People v. Ramirez*, 618 N.E.2d 638 (Ill. App. Ct. 1993) (search following stop based on missing license plates led to arrest and weapons search).

¶ 95. The leading case in Wisconsin is *State v. Griffin*, 183 Wis. 2d 327, 329, 515 N.W.2d 535 (Ct. App. 1994), *review denied*, 520 N.W.2d 88 (Wis. 1994), *cert. denied*, 513 U.S. 950 (1994), in which the court of appeals held that the absence of license plates, and reasonable inferences that can be drawn from that fact,

provide reasonable suspicion sufficient to justify an investigatory stop of a motor vehicle. In addition, in *State v. Mata*, 230 Wis. 2d 567, 576, 602 N.W.2d 158 (Ct. App. 1999), the court of appeals ruled a weapons search following a stop of a car with no license plates was properly based upon probable cause. The court there did not find the need to address the validity of an investigatory stop for lack of license plates, nor apparently did the defendant. *Id.* at 568–76. Earlier this term, this court considered a case in which a van was stopped because the "van had no front license plate." *State v. Matejka*, 2001 WI 5, ¶ 3, 241 Wis. 2d 52, 621 N.W.2d 891. The validity of the stop in that case was not questioned by this court or the defendant, Matejka. *See id.* at ¶ 36 (addressing only defendant's argument about consent to search, not the validity of the stop). Apparently, the notion that a missing license plate permits an investigatory stop of a motor vehicle has become so well established that defendants and courts accept it.

¶ 96. In this case, the police investigated a tip that people were selling drugs out of a vehicle parked in an alley behind 4261 North Teutonia Avenue. They cautiously approached the vehicle. The absence of license plates on that vehicle, obstructing all possibility of running a license check on the vehicle without first dealing with its occupants, added significantly to the reasonable suspicion for an investigatory stop.

¶ 97. Reasonable suspicion is a smaller quantum of evidence than probable cause. Reasonable suspicion is all that is required for an investigatory stop because the temporary seizure of a person in an investigatory stop is less than the complete and lasting seizure of a person in an arrest.

681

¶ 98. In my view, under the totality of the circumstances, the two officers here had reasonable suspicion to make an investigatory stop of Roosevelt Williams. They were acting on a tip from a known or readily identifiable informant who had put herself at risk of prosecution for any false statements to police. The informant said she was observing a crime in progress. The informant's assertions were partially confirmed by the dispatcher and partially corroborated by officers when they arrived at the scene four minutes later. The officers then found a vehicle without a front license plate, with two occupants, one of whom created fear for the officers because of the position of his arm. I agree with a great deal of the majority's opinion but find it more accurate and compelling to analyze this case as one that does not involve an anonymous informant. Accordingly, I concur in the mandate.

¶ 99. WILLIAM A. BABLITCH, J. *(dissenting)*. *"There is no there there."* Gertrude Stein, commenting on the city of Oakland.[1]

¶ 100. Two years ago, a majority of this court upheld the same stop and frisk at issue here. *State v. Williams*, 225 Wis. 2d 159, 591 N.W.2d 823 (1999) (Bablitch, J. dissenting) (hereinafter *Williams I*). Williams appealed to the United States Supreme Court, and the Court sent this case back for reconsideration in light of its decision in *Florida v. J.L.*, 529 U.S. 266 (2000).

¶ 101. In a yeoman-like effort to once again uphold this stop and frisk, the majority finds reasonable suspicion from three factors: (1) an anonymous tip

---

[1] John Bartlett, *Bartlett's Familiar Quotations* 627 (Justin Kaplan, ed., 16th ed. 1992).

placed over a 9–1–1 line; (2) an observation by the police that 57-year-old Williams, sitting in a parked Chevy Blazer with a female passenger, had his hand behind the Blazer's passenger seat; and (3) an observation by the police that the vehicle had no license plates. I disagree. When closely examined, these facts do not add up to a constitutionally permissible basis for conducting either an investigatory stop or a limited search for weapons. As with Gertrude Stein's memorable quip, so too with the majority's factors: there is no there there. Accordingly, I respectfully dissent.

I

¶ 102. Turning first to the anonymous tip, I conclude that it has none of the indicia of reliability that may provide a basis for an investigatory stop that is compatible with the Fourth Amendment. An informant's veracity, reliability and basis of knowledge are relevant factors to be considered in determining the value of the tipster's report for the purposes of applying the reasonable suspicion standard. *Alabama v. White*, 496 U.S. 325, 328–29 (1990). Importantly, in *J.L.* the Supreme Court emphasized that reasonable suspicion requires that the tip be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272. Analyzing the tip in this case with these factors in mind, the only reasonable conclusion to draw is that this tip is indistinguishable from the unknown, unaccountable informant in *J.L.*

¶ 103. Here, the majority asserts that the anonymous caller's basis of knowledge adds reliability to the tip. What is the caller's basis of knowledge in this case?

¶ 104. The majority repeatedly asserts that this tipster is an eyewitness to criminal activity. The major-

ity asserts that "the anonymous tipster explains exactly how she knows about the criminal activity she is reporting: she is observing it." Majority op. at ¶ 33. "Quite simply. . .the tipster here has made plain that she is an eyewitness." *Id.*

¶ 105. The majority's assertions are incorrect and are not borne out by the record of the call. The anonymous caller described the car, but there is absolutely nothing else in the caller's statement to lead to the conclusion that she actually witnessed criminal activity. Instead, the caller's statement provides only a conclusory assertion of illegal conduct. For all we can tell from the record, her allegation of criminal wrongdoing is based upon nothing more than " 'idle rumor or irresponsible conjecture.' " *United States v. Phillips*, 727 F.2d 392, 397 (5th Cir. 1984) (quoting *United States v. Bell*, 457 F.2d 1231, 1238 (5th Cir. 1972)).

¶ 106. Professor LaFave's commentary is noteworthy:

> It makes no sense to require some "indicia of reliability" that the informer is personally reliable but nothing at all concerning the source of his information, considering that one possible source would be another person who was totally unreliable. It may be argued, of course, that most informers report personal observations, and thus such should be assumed to be the case when the lesser standard for a stop rather than the arrest standard is being considered. But there is simply no established need to go to this extreme; as Justice White once observed, "if it may be so easily inferred * * * that the informant has himself observed the facts or has them from an actor in the event, no possible harm could come from requiring a statement to that effect."

4 Wayne R. LaFave, *Search and Seizure* § 9.4(h) 221 (3d ed. 1996) (quoting *Spinelli v. United States*, 393 U.S. 410 (1969) (White, J. concurring) (footnotes omitted)).

¶ 107. The anonymous caller in this case is no more reliable than the anonymous caller in *J.L.*, "who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *J.L.*, 529 U.S. at 271.

¶ 108. The majority also concludes that the tipster was reliable because, unlike the unknown caller at an unknown location in *J.L.*, this caller revealed self-identifying information by giving her address. Majority op. at ¶ 34. In this instance, that information revealed little because the address was for an apartment building. The record does not tell us if 50 people or 500 lived at this address. As a result, no greater veracity or reliability can be attributed to the caller in this case than to any other nameless, unknown informant.

¶ 109. There is little support for the majority's contention that the caller's information is reliable because she put her anonymity at risk. Majority op. at ¶ 35. All of the evidence points to the conclusion that the caller thought she was placing an anonymous call. She started the call by saying she did not want to get involved. She did not provide her name, her telephone number, or her apartment number at 4261 North Teutonia. Despite this absence of meaningful identifying information, the majority opinion attempts to bolster the tip's reliability by characterizing the caller as a citizen informant, and accordingly more reliable than an anonymous tipster. Majority op. at ¶ 36. However, there is no basis in the record from which to conclude that the caller was what could be viewed as the classic citizen informant, an identified informant

who either actually witnessed a crime or was the victim of a crime.

¶ 110. This classic citizen informant case was presented in *State v. Doyle*, 96 Wis. 2d 272, 291 N.W.2d 545 (1980), overruled on other grounds by *State v. Swanson*, 164 Wis. 2d 437, 475 N.W.2d 148 (1991). In *Doyle*, two named informants—Mark and Leigh Livermore—contacted police and reported witnessing drug dealing. *Id.* at 286. This court characterized the Livermores as "two knowledgeable citizen eyewitnesses," and distinguished citizen informers from " 'police contacts or informers who usually themselves are criminals.' " *Id.* at 286–87 (quoting *State v. Paszek*, 50 Wis. 2d 619, 630, 184 N.W.2d 836 (1971)).

¶ 111. The majority's reliance upon the citizen informant analysis in *Doyle*, and in *State v. Boggess*, 110 Wis. 2d 309, 316, 328 N.W.2d 878 (Ct. App. 1982), must be approached cautiously. Majority op. at ¶ 36. Categorization of a tip as one from a "citizen" informant, as opposed to an "anonymous" informant, may be relevant to assessing an informant's reliability under the totality of the circumstances analysis. However, both *Doyle* and *Boggess* were decided before the Supreme Court abrogated *Aguilar v. Texas*, 378 U.S. 108 (1964).[2] Accordingly, it is questionable whether a tip labeled as one from a citizen informant should receive a "relaxed test of reliability," majority op. at ¶ 36, when the issue before the court is an assessment of reasonable suspicion under the totality of the circumstances.

¶ 112. In a further attempt to distinguish the present case from *J.L.*, the majority points out that in *J.L.* there was no audio recording of the anonymous

[2] *Aguilar v. Texas*, 378 U.S. 108 (1964) was abrogated by *Illinois v. Gates*, 462 U.S. 213 (1983).

call, while in the present case a recording was made of the call. But the recording of the 9–1–1 conversation does nothing to establish the reliability of the caller. Majority op. at ¶ 37. The recording merely supports the officers' testimony that the call actually occurred and eliminates any speculation that the anonymous tip was fabricated by the police.

¶ 113. Again attempting to distinguish *J.L.*, the majority relies upon the fact that the anonymous call was placed over the 9–1–1 system. It is argued that Milwaukee may have developed a "sophisticated emergency phone system" that contains an "automatic location identification and automatic number identification." According to the majority, the caller exposed herself to risk of prosecution for making a false report because the 9–1–1 system may assist the police in tracing the anonymous caller. This is total speculation. The majority concedes, as it must, that there is nothing in the record to support the conclusion that Milwaukee actually had in place such a system at the time the call in this case occurred. Majority op. at ¶ 38. Instead, it relies upon the fragile inference that because the operator said "um hmm" after the caller volunteered her address that the caller's address was in fact automatically identified in the 9–1–1 system. Majority op. at n. 14. This analysis illustrates the lengths the majority must stretch to find anything in the record that would support a contention that Milwaukee had an operating "sophisticated emergency phone system" at the time the events in this case took place; it is simply unpersuasive.

¶ 114. In *Williams I* the argument was also made that a tip over the 9–1–1 system has a higher degree of reliability. Professor LaFave, commenting upon this court's decision in *Williams I*, pointed out that there is

no reason to conclude that the caller was aware she had put her identity at risk.

> [I]t seems that the *Williams* concurrence ends one step short; it stresses that the police were aware of these characteristics of their 911 system, but surely that in and of itself is unimportant, for if the *Williams* caller deserves to be viewed as not anonymous and thus more reliable than the *White* informant, then surely the question is the *informer's* perception that his or her identity could easily be determined by the police and that false information might lead to criminal prosecution. And thus the ultimate question, at best alluded to only indirectly in *Williams*, is whether in the locale in question there exists such widespread public awareness of the characteristics of the 911 system and of criminal sanctions for false information that it is permissible for the police to presume that each 911 caller possesses such information.

4 Wayne R. LaFave, *Search and Seizure* § 9.4(h) (Supp. 2001) (footnotes omitted).

¶ 115. In short, the majority's assertion that the caller is reliable because she put her identity at risk is incorrect because there is no reason to believe that she *knowingly* did so. And on that point, it is more reasonable to assume that the caller was unaware that her identity would possibly be at risk, for she began the conversation by stating that she did not "want to get involved." It is essential to keep in mind that our analysis here is whether or not the officers had reasonable suspicion to conduct a *Terry* stop, and not simply whether or not the police should investigate anonymous calls reporting ongoing criminal activity. Because the caller did not knowingly or intentionally risk her anonymity, her assertion of criminal activity is

less reliable and the officers were accordingly required to obtain more information to establish reasonable suspicion.

¶ 116. Finally, the majority contends that the tip's assertion of criminal activity is reliable because the police corroborated the innocent details provided in the tip. Majority op. at ¶¶ 40–41. However, corroboration of innocent details relayed by an anonymous tipster only gives rise to an inference that the caller is telling the truth about the alleged criminal activity when the detail from the tip establishes that the informant had an adequate basis of knowledge. *State v. Richardson*, 156 Wis. 2d 128, 142, 456 N.W.2d 830 (1990). For example, in *White*, the quintessential anonymous tip case, a tipster reported that Vanessa White would leave a specific apartment, at a particular time, in a particular vehicle, and would proceed to a specific location. *White*, 496 U.S. at 327. The caller also alleged that she would be carrying cocaine. *Id.* A majority of the Supreme Court concluded that police corroboration of the tip information established that the tip was reliable and that the anonymous caller's ability to predict White's behavior established the caller's basis of knowledge. *Id.* at 332. The Court concluded that "[b]ecause only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individuals illegal activities." *Id.* In *J.L.*, the Court restated this principle: "The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272.

¶ 117. This court followed the reasoning of *White*, in *Richardson*, where an anonymous caller provided police with a highly detailed tip containing unique and specific facts. *Richardson*, 156 Wis. 2d at 142. The corroboration of this cumulative detail, along with reasonable inferences, supplied reasonable suspicion to justify a stop. *Id.* In other words, in *Richardson*, it was not the mere fact that the caller provided innocent details that were subsequently corroborated that made the tip reliable. The tip was reliable because the details provided by the caller would be known by someone intimate with the suspect's affairs; therefore, because the tipster knew these intimate details he or she likely was correct in asserting criminal conduct.

¶ 118. In contrast, the case at hand presents precisely the type of corroboration of the innocent aspects of a tip that the Supreme Court has indicated are not sufficient. As *J.L.* has instructed, information about readily observable details alone does not make a tip reliable in its assertion of illegality. *J.L.*, 529 U.S. at 272. The only detail provided by the caller in this case is a description of a parked vehicle that she observed through her apartment window. Corroboration of these few facts does not bring reliability to the caller's allegation of criminal activity. Thus, on the one hand the majority contends that the caller is reliable because it construes her report to be one in which the caller is observing criminal activity first hand. On the other hand, the majority asserts that the caller is reliable because police corroboration of innocent aspects of the tip lends credibility to the tip's assertion of criminal conduct, even though the tip reports only what could ostensibly be observed through a window and, therefore, neither establishes that the caller had any intimate knowledge of the suspect's affairs nor that

that caller had any inside information concerning illegal conduct. This tipster is apparently both an eyewitness and, pursuant to *White* and *Richardson*, in a confidential relationship with the suspect.

¶ 119. In fact, however, the tip in this case does not satisfy the test set forth in *J.L.*, for the caller neither explained how she knew about the alleged criminal activity nor did her tip supply any basis for believing that she had inside information. *J.L.*, 529 U.S. at 271. As a result, this tip adds no weight to the reasonable suspicion calculation. Despite the sound and fury, these facts signify nothing.

## II

¶ 120. "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *White*, 496 U.S. at 330. The tip here, in my opinion, is unreliable for the purposes of providing a basis for reasonable suspicion to stop Williams. In its analysis of the totality of the circumstances the majority relies upon two additional facts which, it argues, combine with the tip to create reasonable suspicion for an investigatory stop. The first of these is that the officers had reason to suspect that criminal activity was afoot because Williams' hand was extended behind the passenger seat. The second was the officers' observation that the car had no license plates. Neither of these facts, alone or together, sustains its conclusion.

¶ 121. In finding the placement of Williams' arm behind the passenger seat a reason to be suspicious, the majority notes, as it must, that Williams did not make a furtive gesture. Accordingly, it is unreasonable to conclude that Williams may have been reaching for a

weapon or concealing evidence as he saw the officers approach the vehicle. Majority op. at ¶ 43. The circuit court did not reach a definitive conclusion as to when Williams placed his hand behind the seat. Officer Norred testified that when the officers pulled up to the Blazer, he "observed the driver's hand was behind the passenger seat." During cross-examination by defense counsel the following exchange occurred:

> Q: [I]t would not be accurate to say that you observed him move his hand from–say from his lap to his right or reaching over behind the seat, it was already there, true?
>
> A: As I recall, it was already back there; I mean, from the point that I first observed him.
>
> . . .
>
> When I first noticed him, he had his hand there already, and we were right up in front of him at this point.

¶ 122. The position of Williams' arm is only an innocent detail that adds no weight to the reasonable suspicion calculation. It is likely that in a significant percentage of cases, when an individual is sitting in a parked truck, perhaps elevated slightly higher that one would be in a car, his or her hand may not be in view. Furthermore, contrary to the inference in the majority opinion, Williams was not "reaching" because he saw the officers. Officer Norred testified that Williams' hand was already behind the seat when the officers arrived at the scene.

¶ 123. Then there is the license plate issue. The majority notes that the lack of license plates on the vehicle was not a fact specifically developed or relied upon by the circuit court. Majority op. at ¶ 45. The lack

of license plates on a vehicle is indicative of nothing more than a lack of license plates. It certainly provides no independent corroboration of the reliability of the tip, for the lack of license plates was not mentioned by the caller. Neither the officers nor the circuit court relied on the lack of plates to justify the stop, and as a result, the issue was not explored at the suppression hearing. We should not rely on it either for it does not give rise to a reasonable suspicion of drug dealing; any argument that the officers were investigating a traffic violation is simply post hoc reasoning.

¶ 124. I disagree with the majority's conclusion that the officers had a basis for conducting an investigatory stop. However, even if the stop were proper based solely upon the vehicle's alleged lack of license plates, the subsequent frisk was not.

> [T]he search of a passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The majority justifies the frisk primarily on the basis of the position of Williams' arm and the close quarters in which the stop occurred. As has already been discussed, these events took place during broad daylight. Williams did not make a furtive move or engage in any other evasive or suspicious actions. There is no allegation that this was a high crime neighborhood. The anonymous caller

did not allege that the suspect had a gun. Because the record is devoid of facts that would support a suspicion that Williams was dangerous or may have access to weapons, the majority's conclusion on this point seems to be that, when there is an allegation of drug dealing, officers may reasonably believe that the suspect is armed and dangerous. This conclusion, however, is simply a reconstitution of the type of per se, blanket reasoning that the Supreme Court has so thoroughly and explicitly held to be impermissible. *See Richards v. Wisconsin*, 520 U.S. 385 (1997).

¶ 125. In sum, the facts of this case relied upon by the majority do not satisfy even the minimal constitutional standards required for a lawful stop or frisk. Accordingly, I respectfully dissent.

¶ 126. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.