STATE of Wisconsin, Plaintiff-Appellant,

v.

Michael A. SISK, Defendant-Respondent.

Court of Appeals

*No. 00–2614–CR. Submitted on briefs July 6, 2001.—Decided July 31, 2001.*

2001 WI App 182

(Also reported in 634 N.W.2d 877.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Christian R. Larsen*, assistant attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Elvis Cardell Banks*, of the *Law Offices of Elvis Cardell Banks*, of Milwaukee.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. SCHUDSON, J. The State of Wisconsin appeals from the trial court order dismissing the charge of possession of a f irearm by a felon, against Michael A. Sisk, following a suppression motion hearing. The State argues that the court erred in viewing the informant's 9-1-1 call in this case as an anonymous tip and, therefore, in failing to correctly consider the totality of the circumstances. Because the 9-1-1 caller in this case gave what he said was his name, we agree with the State. Accordingly, we reverse.

¶ 2. The facts are undisputed. They were offered at the motion hearing by the parties' stipulation to: (1) the information in the computer-assisted dispatch re-

port of the 9-1-1 call;[1] and (2) the information in the police reports prepared by the arresting officer, his partner, and the detective who interviewed Sisk following the arrest.

¶ 3. At 11:42 P.M. on February 9, 2000, a City of Milwaukee Police Department dispatcher received a telephone call from a person reporting that he had seen two men enter a building at 2466 North Teutonia Avenue with guns.[2] The caller described their race and clothing, and he also said that his name was "Sedrick Forbes."

¶ 4. Police officers responded to the target address, arriving at 11:48 P.M. They observed two men, matching the caller's descriptions, sitting in a car one-half block from 2466 North Teutonia Avenue. The police approached the car, briefly questioned the suspects, and one of the officers asked Sisk, who was in the passenger's seat, to get out. The officer frisked Sisk and found a gun in his pants pocket.

¶ 5. Ruling that the police did not have reasonable suspicion to stop Sisk, the trial court granted his motion to suppress. Significantly, the court commented that "the critical legal decision" it had to make was whether the call was "an anonymous tip or not." Concluding that it was, the court reasoned that the fact that the caller gave a name was not enough to establish the reliability of the information because the call (coming

---

[1] "The term '9-1-1' refers to emergency assistance telephone number." *State v. Williams*, 2001 WI 21, ¶ 4 n.1, 241 Wis. 2d 631, 623 N.W.2d 106; *see* Wis. Stat. § 146.70 (1999–2000).

[2] The call was made from a coin-operated telephone at Curly's Grocery Store, located at 2451 West Center Street. This court notes that 2451 West Center Street is approximately fourteen blocks away from 2466 North Teutonia Avenue in Milwaukee.

from a payphone), and the caller (leaving nothing other than his name to identify himself), had not allowed for verification. The court stated:

> [I]f there was something about Mr. Forbes giving his name that help [sic] us link back to him so we could prosecute him if it was a false tip[,] or if there is something there where we could track it down to flush it out or corroborate or to have him come to court and tell us what he saw, then I would say it's not an anonymous tip[,] but simply giving us his name and calling from a pay phone is the same in my mind as if he was anonymous.

Therefore, the court explained, because the tip "gave no predictive information and the information that it gave about Mr. Sisk's clothing and his location is something that anybody on the street who is willing to make something up about Mr. Sisk could have given," the information was insufficient to justify the stop.

¶ 6. The State argues that the trial court erred in viewing the call as an anonymous one. The State contends that because the caller gave what he said was his name, this case is significantly distinguishable from *Florida v. J.L.*, 529 U.S. 266 (2000), in which the United States Supreme Court concluded that "an anonymous tip that a person is carrying a gun is, without more, [in]sufficient to justify a police officer's stop and frisk of that person." *Id.* at 268. The State is correct.

¶ 7. A trial court's determination of whether undisputed facts establish reasonable suspicion justifying police to perform an investigative stop presents a question of constitutional fact, subject to *de novo* review. *See State v. Williams*, 2001 WI 21, ¶ 18, 241 Wis. 2d 631, 623 N.W.2d 106. As the Wisconsin Supreme Court recently reiterated:

A law enforcement officer may lawfully stop an indi-
vidual if, based upon the officer's experience, she or he
reasonably suspects "that criminal activity may be
afoot." Wisconsin codified the *Terry* [*v. Ohio*, 392 U.S. 1
(1968)] stop standard in Wis. Stat. § 968.24. We deter-
mine whether a stop was lawful in light of *Terry* and the
cases following it.

In determining whether the police have lawfully
conducted a *Terry* stop, we consider the totality of the
circumstances. "Reasonable suspicion, like probable
cause, is dependent upon both the content of informa-
tion possessed by police and its degree of reliability.
Both factors—quantity and quality—are considered in
the 'totality of the circumstances—the whole pic-
ture,'. . . ." The totality-of-the-circumstances approach
views the quantity and the quality of the information as
inversely proportional to each other. "Thus, if a tip has
a relatively low degree of reliability, more information
will be required to establish the requisite quantum of
suspicion than would be required if the tip were more
reliable." Conversely, if the tip contains a number of
components indicating its reliability, then the police
need not have as much additional information to estab-
lish reasonable suspicion.

In considering the totality of the circumstances,
however, our focus is upon the reasonableness of the
officers' actions in the situation facing them. "The
essential question is whether the action of the law
enforcement officer was reasonable under all the facts
and circumstances present."

*Williams*, 2001 WI 21 at ¶¶ 21–23 (citations and foot-
note omitted).

¶ 8. Here, because the caller gave what he said
was his name, the trial court erred in viewing the call as
an anonymous one. Whether the caller gave correct
identifying information, or whether the police ulti-

mately could have verified his identity, the fact remains that the police could have reasonably concluded that the caller, "by providing self-identifying information, . . . risked that [his] identity would be discovered." *See id.* at ¶ 35. Therefore, unlike the situation in *J.L.*, where the tip was from "an unknown location by an unknown caller," *J.L.*, 529 U.S. at 270, here the caller provided "self-identifying information"—his name.

██

¶ 9. "[I]f 'an informant places his [or her] anonymity at risk, a court can consider this factor in weighing the reliability of the tip.' " *Williams*, 2001 WI 21 at ¶ 35 (quoting *J.L.*, 529 U.S. at 276, Kennedy, J., concurring). Further, when a caller gives his or her name, police need not verify the caller's identity before acting on the tip.[3] *State v. Kerr*, 181 Wis. 2d 372, 381, 511 N.W.2d 586 (1994) (" '[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case.' ") (citation omitted). As the Wisconsin Supreme Court declared, "we view citizens who purport to have witnessed a crime as reliable, and allow the police to act accordingly, even

---

[3] An obvious exception, of course, could arise where police believe the caller is "a prankster." *See Williams*, 2001 WI 21 at ¶ 35 n.11. In this case, nothing suggests that the caller was anyone other than a concerned citizen.

The evidence in this case established that the police did not locate the caller or confirm his identity before responding to the scene. The prosecutor informed the trial court that he did not know whether police attempted to locate the caller after Sisk's arrest, but the computer-assisted dispatch report of the 9-1-1 call reflects an entry for February 10, 2000, at 12:02 A.M.: "unable to locate complt."

though other indicia of reliability have not yet been established." *Williams*, 2001 WI 21 at ¶ 36. *See also State v. Paszek*, 50 Wis. 2d 619, 631, 184 N.W.2d 836 (1971) (" 'A citizen who purports . . . to have witnessed a crime is a reliable informant even though his reliability has not theretofore been proved or tested.' ") (quoted source omitted). Dangerously, any other holding would require police to take critically important time to attempt to verify identification rather than respond to crimes in progress.[4]

¶ 10. Thus, in this case, the reasonableness of the police suspicion is more firmly based than that in *J.L.* The caller gave information about the suspects and

---

[4] *See United States v. Valentine*, 232 F.3d 350 (3d Cir. 2000), *cert. denied*, 121 S. Ct. 1748 (2001), in which the court, refusing to "second-guess the officers' decision to pursue the suspect immediately," commented that had the police "stalled for more lengthy questioning of the informant, the armed suspect could have escaped detection." *Id.* at 355. Thus, the court explained, "[w]hat matters . . . is not that the officers could guarantee that they could track down the informant again," but rather, "whether the tip should be deemed sufficiently trustworthy in light of the total circumstances." *Id.* Although *Valentine* involved a face-to-face contact between the police and the informant, and although, therefore, the police had an immediate opportunity to assess the demeanor of the informant to help them measure his credibility, the legitimate concerns the court expressed about police delay are equally applicable here.

Indeed, in a case like the instant one, taking the time to confirm a caller's identity could compromise the caller's information; time would pass, and the situation reported by the caller could change. Thus, understandably, in neither *Williams* nor the instant case did the police pause. In *Williams*, "the officers arrived at the scene four minutes after the dispatch," *Williams*, 2001 WI 21 at ¶ 40 n.17, and here, the police arrived three minutes after the dispatch.

their location, which the police verified before stopping them. The caller also gave what he said was his name. We see no legal or logical reason to indulge the factual fiction that would convert this non-anonymous call to an anonymous one, and thus exclude its apparent reliability as a very significant factor to be considered in "the totality of the circumstances" determining the lawfulness of the investigative stop. *See Williams*, 2001 WI 21 at ¶ 22.

██

¶ 11. Accordingly, we conclude that when a caller identifies himself or herself by name, thus providing "self-identifying information" that " 'places his [or her] anonymity at risk,' " *see id.* at ¶ 35, and when the totality of the circumstances establishes a reasonable suspicion that " 'criminal activity may be afoot,' " *see id.* at ¶ 21, the police may execute a lawful stop, *see id.* at ¶¶ 21–23; *see also* WIS. STAT. § 968.24 (1999–2000).

*By the Court.*—Order reversed.[5]

────────────

[5] The State notes that in the trial court neither the parties nor the court addressed the legality of the frisk of Sisk, following the stop. The trial court, however, had no reason to address the legality of the frisk because: (1) it concluded that the stop was unlawful; and (2) defense counsel's trial court brief in support of the motion to suppress and defense counsel's oral argument at the motion hearing established that Sisk's challenge was based exclusively on the theory that the informant's call was "an anonymous call from a pay phone" that "provided the police without means to test the informant's knowledge or credibility," and, therefore, "[s]ince the police did not have any reasonable, articulable basis for asking Mr. Sisk to step out of his car, the gun seized is the product of an illegal search and should be suppressed as fruit of the poisonous tree."